UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES,<br><br>               Plaintiff,<br><br>v.<br><br>UNITED STATES FOREST SERVICE; RANDY MOORE, Chief of the Forest Service; CARL PETRICK, Forest Supervisor for the Idaho Panhandle National Forest; and JESSIE BERNER, Sandpoint Ranger,<br><br>               Defendants. | Case No. 2:23-cr-00290-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court is Plaintiff Alliance for the Wild Rockies' ("Alliance") Motion for Summary Judgment (Dkt. 37) and Defendants United States Forest Service, Randy Moore, Carl Petrick, and Jessie Berner's (collectively, "the Forest Service") Cross-Motion for Summary Judgment (Dkt. 40).

The Court held oral argument on May 5, 2025, and took the motions under advisement. Upon review, and for the reasons set forth below, the Court DENIES Alliance's Motion for Summary Judgment and GRANTS the Forest Service's Motion for Summary Judgment.

## II. BACKGROUND

### A. Factual Background

This action challenges the Buckskin Saddle Integrated Restoration Project (the "Project") under the Administrative Procedures Act. The Project is located in the Idaho Panhandle National Forest in Bonner County, Idaho, on the east side of Lake Pend Oreille and to the south of the Clark Fork River. The lands on which the Project sits are managed by the Sandpoint Ranger District.[1]

Much of the Project area consists of mature forests and large trees and is home to wildlife species that specifically depend on old growth trees. The purpose of the Project is to "reduce fire hazard and improve forest landscape resiliency by providing for forest composition and structure that best resist insects and disease" and "aid[] fire suppression efforts to reduce the potential impacts of wildfire . . . ." AR002541.[2] The Project is necessary because "there are several resources in the project area that are trending away from their respective desired conditions as outlined in the forest plan." AR002618.[3] In other words, the goal of the Project is to achieve the desired conditions of the Forest Plan in the Project area to preserve and protect the forest for future generations.

---

[1] A small portion of the Project is in the Coeur d' Alene River Ranger District in Shoshone County, Idaho.

[2] The administrative record is this case is expansive. It was provided to the Court on a flash drive. Dkt. 27. To remain consistent with the parties, the Court will cite to the administrative record itself for any relevant citations.

[3] A "forest plan" is a comprehensive document that guides resource management activities in a national forest. Here, the applicable forest plan is the 2015 Land Management Plan for the Idaho Panhandle National Forest ("Forest Plan"). The Forest Plan contains targets, in the form of "desired conditions," for various factors affecting vegetation, wildlife, and other resources in the relevant area. AR000020-27.

To accomplish that goal, the Project hopes to improve the resiliency and resistance of the forest to disturbances like wildfire, drought, insects, and disease; reduce and augment fuels to decrease risk of severe wildfire; reduce sediment delivery to streams from roads and trails; and improve flammulated owl habitat. Specifically, the Project authorizes approximately 13,000 acres of timber harvest, along with approximately 6,500 acres of noncommercial vegetative treatments and fuel reduction. The Project is anticipated to take between ten and fifteen years to complete.

The Forest Service engaged in a public outreach program and solicited feedback for the Project. Following these efforts, the Forest Service issued a Draft Environmental Assessment ("EA") in January 2020, and published a notice of opportunity for the public to comment on the draft EA. After receiving and responding to comments and adjusting the Project, the Forest Service then issued the Final EA in July 2020. In April 2021, after holding an administrative objection period, the Forest Service issued a Decision Notice ("DN") and Finding of No Significant Impact ("FONSI") approving the Project.

The North Zone Roadside Salvage Project ("Salvage Project") is a road maintenance project involving vegetation removal that will be conducted within the Buckskin area.[4] The Salvage Project involves "the salvage of dead and dying trees along [certain] road segments" (AR002636), "clearing brush from the road shoulders" (AR002631), and road reconstruction to improve drainage and safety (*Id*). No work has begun on these tasks yet;

---

[4] The parties discuss the Salvage Project in a manner that makes it appear to be separate from the broader Project. However, as best the Court can tell, the Salvage Project is one component *within* the Project. Regardless, the Court will discuss the Salvage Project separately as have the parties.

however, the EA states the Salvage Project is a "reasonably foreseeable" action. AR002635-6.

### B. Procedural Background

On June 14, 2023, original Plaintiffs Alliance and Native Ecosystems Council filed suit alleging the Project (and the Salvage Project) violates the National Environmental Policy Act ("NEPA"), the Healthy Forests Restoration Act, and the National Forest Management Act ("NFMA").

Early on, the Forest Service moved to dismiss Native Ecosystems Council as a party—along with multiple claims—because Plaintiffs had waived and/or failed to exhaust their administrative remedies prior to filing suit. Dkt. 12. In ruling on that Motion, the Court dismissed Native Ecosystems Council as a Plaintiff and also dismissed Claims Two, Three, Four, and Five. *See generally* Dkt. 30. The Court also dismissed specific allegations in Claim Six regarding biophysical settings in the Project area. *Id*. at 18–20.

Alliance's remaining claims at this stage are: Claim One, which alleges the Forest Service violated NEPA by not adequately disclosing or analyzing the Project's impacts on certain animal species (Dkt. 1, ¶¶ 86-93); the portion of Claim Six alleging the Forest Service violated NEPA by not adequately disclosing or analyzing how the Project will move the Project area toward desired conditions in the Forest Plan (Dkt. 1, ¶¶ 119-22); Claim Seven, which alleges the Forest Service violated NEPA and NFMA by not adequately disclosing or analyzing old growth forest and the Project's impacts to it (Dkt. 1, ¶¶ 123-28); and Claim Eight, which alleges that the Forest Service violated NEPA by not adequately analyzing cumulative impacts from the Salvage Project (*Id*. at ¶¶ 129-32).

For context, a brief history of NEPA is helpful.

Congress enacted NEPA, 42 U.S.C. §§ 4321-4370m-12, to establish a process for federal agencies to consider the environmental impacts of major federal actions. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,* 435 U.S. 519, 558 (1978). NEPA imposes procedural, rather than substantive, requirements on federal agencies, and it is "well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *see also Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012).

Forest Service actions that directly affect the physical environment are generally subject to NEPA and are analyzed in an environmental impact statement ("EIS"), an EA, or a categorical exclusion ("CE"). *See* 40 C.F.R. §§ 1500.1-1508.28; 36 C.F.R. § 220.6.

Under NEPA, federal agencies must prepare an EIS for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C). To determine whether an action requires an EIS, the agency typically prepares an EA, which is a "concise" analysis that may result in a FONSI. 40 C.F.R. § 1501.4(b); *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006) ("If the agency concludes there is no significant effect associated with the proposed project, it may issue a FONSI in lieu of preparing an EIS.").

That is what happened in this case. The Forest Service prepared a draft EA explaining the Project and its goals. It then received public comments, revised the Project as needed, and issued a final EA. After the administrative review of the final EA, the Forest Service issued a FONSI instead of preparing an EIS. It is this analysis and process—or the

perceived lack of analysis and process—Alliance challenges today.

### III. LEGAL STANDARD

#### A. Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, the Court must "view[] the facts in the non-moving party's favor." *Id.*

To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted). Accordingly, the Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

The standard applicable to motions for summary judgment does not generally change if the parties file cross motions. *See, e.g., Cady v. Hartford Life & Accidental Ins.,*

930 F. Supp. 2d 1216, 1223 (D. Idaho 2013). That said, the Court must evaluate each party's motion on its own merits. *Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## B.  APA and NEPA

A court's review of an agency's compliance with NEPA (and NFMA) is governed by the Administrative Procedure Act ("APA"). *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012) ("Because NFMA and NEPA do not provide a private cause of action to enforce their provisions, agency decisions allegedly violating NFMA and NEPA are reviewed under the [APA]." (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238 (9th Cir. 2005)).

In this context, the Court's role "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985). Under the APA, agency action must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). "This standard is highly deferential, presuming that agency action to be valid." *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1084 (9th Cir. 2011) (quoting *Nw. Ecosystem All. v. FWS*, 475 F.3d 1136, 1140 (9th Cir. 2007)); *see also River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067 (9th Cir. 2010). The Court must "not substitute [its] judgment for that of the agency." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (cleaned up), *abrogated on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008). "The agency's action need only be a reasonable, not the best or most reasonable, decision." *River*

*Runners*, 593 F.3d at 1067 (cleaned up).

Thus, the Court may not overturn an agency decision "because it disagrees with the decision or with the agency's conclusions about environmental impacts." *Id.* at 1070. The Court must "affirm[] the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All.*, 475 F.3d at 1140 (cleaned up). For an action to be upheld, the agency need only articulate a "rational connection between the facts found and choice made." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

The Court is "most deferential" where, as here, "the agency is making predictions, within its area of special expertise, at the frontiers of science." *Lands Council*, 537 F.3d at 993 (cleaned up). *See also San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (explaining that, when examining "scientific determination[s] . . . a reviewing court must generally be at its most deferential") (cleaned up).

## IV. ANALYSIS

For organizational purposes, the Court will follow the parties' briefing which takes the claims up in the following order: Claim Six, Claim One, Claim Eight.

Although Claim Seven was not previously dismissed, Alliance did not include any argument regarding Claim Seven in its summary judgment briefing. As a result, the Forest Service requests dismissal of that claim with prejudice. Dkt. 41, at 9 n.2. At oral argument, Alliance agreed it was no longer pursuing Claim Seven and that it could properly be dismissed. Accordingly, Claim Seven is DISMISSED.

### A. Claim Six

The parties disagree how much, if any, of Claim Six is now properly before the

Court. As such, before analyzing the substance of Claim Six, the Court must address the scope of its prior decision and which portions of Claim Six survived.

In its prior decision, the Court summarized Alliance's sixth claim as a three-part allegation relating to the Forest Service's: "[1] failure to disclose and consider the Project area's biophysical setting, [2] failure to disclose which treatment units occur in which habitat type, and [3] failure to analyze and determine whether the Project will meet or trend toward desired conditions . . . of the Forest Plan." Dkt. 30, at 18 (*citing* Dkt. 1, at 18).

The Forest Service alleged in its Motion to Dismiss that Alliance had waived these claims or otherwise failed to exhaust its administrative remedies because it did not raise objections on these topics during the public comment period. In light of that failure, the Forest Service alleged Alliance was barred from litigating those concerns now. *See All. For the Wild Rockies v. Petrick,* 68 F.4th 475, 487–88 (9th Cir. 2023) (explaining a party's failure to raise a particular concern before an agency, "such as in comments during a public-comment process, usually waives a litigant's rights to [raise that same concern] in court").

As to the first part of Claim Six, the Court agreed with the Forest Service that, while Alliance had made a passing reference to biophysical settings in its comments and objections to the Project, the focus was much more "limited" than what Claim Six appeared to address in this lawsuit. Dkt. 30, at 19. For that reason, the Court held Alliance "did not raise concerns about the biophysical setting(s) of the Project *as a whole*, as it does in Claim Six" and dismissed that portion of the claim. *Id.* (emphasis in original).

The Forest Service now argues the Court's use of the phrase "as a whole" completely forbids any further discussion about biophysical settings. Alliance, on the other

hand, is "hopeful" (Dkt. 44, at 19) that the Court only meant to foreclose its broader claim about biophysical settings and that a narrower claim survived. Further review of the Court's decision is necessary to answer this question. But in the end, Alliance is correct.

Continuing to the second part of Claim Six regarding habitat type, the Court again agreed with the Forest Service that Alliance had not met its burden and that dismissal was appropriate.

The Court then went on to part three of Claim Six, and noted there was "ample evidence in the record that Alliance was concerned about Defendants' failure to determine and disclose whether the Project would push the forest towards the desired conditions laid out in the forest plan." *Id*. at 19. The Court provided those citations and then held that it would be "hard to imagine how Alliance might have provided clearer notice of the argument underlying the *third portion of Claim Six*." *Id*. at 20 (emphasis added).

The Court then concluded:

> Accordingly, the Court finds that Alliance did *not* sufficiently raise concerns about the project area's biophysical setting, nor about which treatment units occur in which habitat type. However, Alliance *did* raise the issue of Defendants' failure to analyze or disclose whether the Project trends towards the forest plan's desired conditions. In other words, Claim Six survives, but only under the theory that Defendants' failure to analyze and determine whether the Project trends towards the forest plan's desired conditions is a violation of NEPA.

*Id*. (emphasis in original).

On summary judgment, the primary hangup seems to be the fact that the Court said the first part of Claim Six (about biophysical settings) could not proceed, but the third part (about forest plan conditions) could proceed when, ostensibly, the third part of Claim Six

*includes* considerations regarding biophysical settings. The Court meant to foreclose a general challenge regarding whether the Forest Service considered the biophysical settings in the Project area because there was no indication Alliance had properly raised that broad of a concern below.[5] Dkt. 30, at 20. But the Court allowed Alliance to proceed on its "desired conditions of the Forest Plan" portion of Claim Six. *Id*. Thus, to the extent biophysical settings are implicated in that more targeted claim, Alliance appropriately raised those conditions as part of the current motions.[6]

The Court accordingly turns to the merits of Claim Six.

In its opening brief, Alliance alleges "the Forest Service violated NEPA when it failed to disclose and evaluate the Project's effects on desired conditions for vegetation." Dkt. 36, at 17. But this is not quite right. The Forest Service evaluated the impact of the Project on vegetation, it just found the impact was not significant. AR2550–53; 2558–59. Alliance's next sentence, however, is more on point in that it alleges, "the EA lacks sufficient evidence and analysis to support its conclusion that [the] Project's effects on vegetation are insignificant." *Id*. And in reply, Alliance more succinctly argued the Forest Service did not provide a "convincing statement of reasons for concluding [the] Project will have insignificant impacts on [the Forest Service's] efforts to achieve the Forest Plan's

---

[5] The Court also clearly foreclosed any claim about which treatment units occur in which habitat type. Dkt. 30, at 20.

[6] And to be sure, even though the Forest Service disagrees that any claims related to biophysical settings are at issue, it responded substantively to Alliance's arguments on this topic. Thus, such matters are squarely before the Court.

desired conditions." Dkt. 44, at 11.[7]

The Forest Service suggests Alliance shifted the goalposts in its Reply brief and contends any argument not included in the Complaint or in Alliance's opening brief is waived. The Court understands the Forest Service's concerns and agrees it is difficult to address a shifting target. But the gist of Alliance's argument has remained the same: the Forest Service failed to properly evaluate the impact of the Project on vegetation in the Project area.

Relatedly, the Forest Service believes Alliance missed the relevant framework through which the Court is to review its actions. It claims that while Alliance cited the correct statute outlining how a reviewing Court must look at the "context and intensity" of the Governmental action on the environment, Alliance did not actually discuss either of those two factors in any of its briefing. This is true. In light of this, the Forest Service suggests Alliance's claims should be reviewed under the "hard look" standard; that is, the Court must ask whether the agency has taken a "'hard look' at the potential environmental consequences of the proposed action*." Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.,* 387 F.3d 989, 993 (9th Cir. 2004). At oral argument, Alliance explained it was not misconstruing or misapplying the relevant standards but was responding to the Forest Service's arguments that had mischaracterized *its* arguments. The Court is not entirely sure this clarifies the confusion, but Alliance repeatedly stated at oral argument that the Forest

---

[7] Said another way, Alliance's argument is not that the Forest Service failed to evaluate the Project's effects on desired conditions for vegetation, but instead that the Forest Service did not provide sufficient evidence and analysis to establish the Project's effects on vegetation are insignificant.

Service did not take a "hard look" at the potential impacts of the Project. Thus, it appears all agree the "hard look" standard is what the Court must utilize today.

Returning to Claim Six itself, Alliance alleges the Forest Service erred by not considering the Project's impact on the "desired conditions" for vegetation in three primary respects: (1) tree size, (2) tree composition, and (3) tree size and composition in different biophysical settings within the Project area. The Court will address each in turn.

### 1. Tree Size

Alliance first asserts the Project does not "convincingly explain" how eliminating trees of a certain size will help achieve the desired conditions of the Forest Plan. Dkt. 36, at 20. Alliance contends the EA is scant on details, percentages, and metrics, and that the Forest Service did not perform a thorough review of how its clear-cutting, burning, logging, and other reduction measures would achieve the desired results regarding tree size in the Project area.

The Forest Service disagrees. Citing the administrative record, it points out where it analyzed the issue, discussed its target metrics, identified existing acreage of each tree class size pre- and post-Project, and outlined how those efforts would move the forest towards the desired conditions in the Forest Plan. Dkt. 41, at 13–15; Dkt. 45, at 14.

Alliance counters by criticizing *where* within the EA the Forest Service retrieved the information. It argues the citations the Forest Service provided are not contained within the "vegetation" section, but rather in the "effect to forest structure" subsection of the "effects to fire and fuels" section. Alliance suggests this illustrates the Forest Service did not do a thorough job and its now trying to cover its bases with anything it can from

MEMORANDUM DECISION AND ORDER - 13

anywhere within the EA.[8] The Court does not see a meaningful difference in *where* the information came from so long as it is there and was available for public review and comment. *See Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988) (explaining a court should not be overly myopic in its review of the record, but rather make a "pragmatic judgment" about the form, content, and preparation of any documents to ensure they allow for informed decision-making and public participation).

NEPA is a procedural statute. The Court will not question the wisdom of where within the EA the information was placed, but rather will assess whether the overall requirements have been met.[9] Additionally, it should be noted that the Forest Plan has outlined *desired* conditions and set forth aspirational goals. Such metrics are often difficult to quantify. But, upon review, the Court finds there was sufficient information in the EA— and its supporting documents—to explain the Forest Service's decision on this matter.

For example, in the Forest Vegetation Report, the Forest Service outlined the existing tress sizes and how differing approaches would, or would not, move the tree size composition towards the desired conditions outlined in the Forest Plan. AR004138-39.

---

[8] Some of Alliance's claims are either hyperbole or wholly incorrect. For example, Alliance claims "the EA doesn't mention or discuss the Project effects on desired tree size class in the project area *at all*." Dkt. 36, at 19 (emphasis added). But this is not true. The EA specifically has charts and commentary on the existing tree sizes, how the Project will affect those areas, and how the changes will help "move towards desired conditions as outlined in the [Forest Plan] . . . ." AR002644. And lest it go unmentioned, the Project's purpose is not *solely* to meet the Forest Plan's desired conditions. There are other stated goals as well. *See* AR002617-18.

[9] Alliance also takes specific issue with the sample size area, the statistical numbers, and the percentages the Forest Service used (or didn't use) in its calculation. But the Forest Service is entitled to use the scale, metrics, and boundaries it deems proper under the circumstances. *See Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 958 (9th Cir. 2003) (holding that the geographical scope of a NEPA analysis deserves deference and is "assigned to the special competency of the appropriate agencies" (cleaned up)).

Ultimately, it found the Project *would* be the best alternative to accomplish those goals. *Id.* In the EA itself, the Forest Service outlined the impacts the Project would have on the various tree sizes before, during, and after implementation, and concluded the overall impact would not negatively affect the vegetation but would instead help achieve the desired conditions. AR002644–47. To be sure, the analysis here comprises roughly five pages of text (out of an almost 100-page document). But there is nothing to indicate more analysis, investigation, or examination was necessary to reach an accurate conclusion. The Forest Service reviewed the tree sizes and how those would be affected moving forward, as well as whether the Project's metrics for cutting, burning, and other remedial efforts were consistent with the Forest Plan. Alliance's general assertion that the Forest Service should have done "more" is insufficient to carry the day.

While Alliance might have done it differently, it has failed to show the Forest Service's analysis was objectively unreasonable or otherwise arbitrary and capricious under NEPA when it comes to tree sizes in the Project area.

### 2. *Tree Composition*

In a similar vein, Alliance argues the Forest Service failed to adequately explain how the Project will move the *composition* of trees in the affected areas towards the "desired future conditions" as outlined in the Forest Plan. The Forest Plan explains that a certain percentage of different tree species should be present within certain target areas. Alliance argues the Forest Service's analysis and percentages are skewed because it only looked at certain treatment areas within the Project area, as opposed to the Project as a whole. Alliance again criticizes where within the EA the Forest Service retrieved its data

to support its position, alleging it comes from a variety of locations outside of the Vegetation Report.[10]

As before, the Court defers to the Forest Service on precisely what area it used to perform its analysis. *See Selkirk Conservation All.*, 336 F.3d at 958. But by all accounts, the Forest Service's methodology appears sound. For instance, the EA contains tables breaking down the tree species composition within Project treatment units by acre including the existing, pre-Project acreage; the post-Project acreage; and the net change in acreage between pre- and post-Project. AR002637-38. *See also* AR004137-45 (Vegetation Report containing charts and discussion about tree composition in the Project area). Further, the EA explains the Project will increase certain types of trees, while reducing others, and that these compositional changes will help "shift the [P]roject area's forest cover type distribution towards desired future conditions." AR002637–38.

To reiterate, the Forest Service is striving for a "target composition" of certain trees. By its very nature, this goal is not strictly defined by absolute metes and bounds. Thus, the EA's review, analysis, and predictions of how the Project will affect the overall tree composition in the forest were sufficient to demonstrate the Forest Service took a "hard look" at the issue and came to a reasonable determination the Project would result in only minimal impacts to the tree composition if implemented.

---

[10] As explained above, the Court does not find any error in the Forest Service using information from different parts of the EA (and/or supporting documents) so long as that information was available to Alliance and the public.

### 3. Biophysical Settings

Having found Alliance can pursue a narrow claim regarding whether the Forest Service considered the "desired conditions" of the aforementioned items—tree composition and tree size—*within* the context of the different biophysical settings of the Project area, the Court moves next to this inquiry.

Alliance again alleges the EA does not mention the Project's effects on desired composition and tree size in different biophysical settings of the Project area "at all." Dkt. 36, at 22. But this is not quite accurate.

While it is true there is not a robust discussion concerning the biophysical settings in the project area, the EA specially explains that it will analyze different areas on a "site-by-site basis" considering ". . . specific factors such as physical site, soils, climate, habitat type, current and future vegetative composition and conditions . . .") in order to tailor the Project for different biophysical settings and ensure the Forest Plan's desired conditions. AR004123. Some of those biophysical settings were already identified and considered as part of the Forest Service's analysis. *See* AR005293–94.[11] And importantly, this review was done with the Forest Plan in mind.

The EA and the Vegetation Report, taken together, explain how the Project moves the biophysical settings within the Project area toward the desired conditions for tree size and species. Alliance seems to be aiming for very specific percentages and targeted outcomes. And to be fair, the Forest Plan sets some target percentages. AR000021–27. But

---

[11] For context, this is an excel spreadsheet with *thousands* of data entries outlining different areas, trees information, acreage, etc.

again, these are "desired" ranges. The Forest Plan also explains in a broader sense that more of the forest needs to be dominated by certain species while reducing other species. AR000020. The Project works toward this species composition goal by reducing the amount of less desirable species and replacing those tree stands with a mix of more desirable species. AR004138.

As above, the Court cannot say on this record that the Forest Services failed to take a "hard look" at this issue or that it lacked a "reasonable basis [] for its decision." *Nw. Ecosystem All.*, 475 F.3d at 1140. For these reasons, the Court finds the Forest Service properly considered the biophysical settings vis-à-vis tree composition and size.

### 4. Conclusion

Alliance claims the Forest Service violated NEPA because it did not adequately address the Project's effects on vegetation conditions—specifically those conditions contained in the Forest Plan as to tree size, tree composition, and the attending biophysical settings. But the Forest Service did address these concerns.

To reiterate two concepts already discussed: first, NEPA does not contain a requirement for any specific results. Second, there is no requirement that the Forest Service satisfy the Forest Plan's desired conditions.[12] Here, the Forest Service took a "hard look"

---

[12] At oral argument, Alliance emphasized it was not arguing the Project must be consistent with the desired conditions or the Forest Plan, but simply that the Forest Service did not adequately support the conclusions in the EA and FONSI. This is a difficult distinction to make because the basis for Alliance's contention that the Forest Service's conclusions are unsupported is, at least in part, the idea that the Project fails to conform with the Forest Plan. Now, one of the Project's stated purposes it to help trend resources towards the desired conditions outlined in the Forest Plan. But because compliance with the Forest Plan is not strictly required under the APA or NEPA, it leaves Alliance's arguments in murky territory—arguing the Forest Service did not do enough, but as it relates to a benchmark that is not required.

at the impact of the Project on the desired conditions and determined there would be no significant impact. Alliance has not shown that decision was arbitrary or capricious. Summary Judgment is, therefore, appropriately granted in the Forest Service's favor on Claim Six.

### B. Claim One

In this claim, Alliance argues the Forest Service violated NEPA when it failed to adequately disclose and assess the impacts the Project would have on wildlife species—particularly those that require large-diameter (i.e. mature, older) trees. Alliance calls out three wildlife species that fall into this category. First, the flammulated owl is a small migratory owl that is dependent on mature forests with significant overstory canopy closure (the degree to which the uppermost layer of tress covers the ground). AR003137. Second, the pygmy nuthatch is a non-migratory bird that prefers larger trees for foraging, nesting, and roosting. AR003137-8. Third and finally, the fringed myotis is a long-eared bat that roost underneath the bark and inside hollows of larger trees. AR003141.

The Project proposes timber harvest of 12,095 acres, 4,192 of which were deemed potentially suitable as habitat for the three identified species. In addition, the Project proposes burning another 3,436 acres, of which 1,980 acers are suitable nesting habitat.

As part of the Wildlife Study conducted in this case, the Forest Service determined that while there may be some impact to flammulated owls, pygmy nuthatches, and fringed myotis or their habitat, such will not likely contribute to a trend towards federal listing or cause a loss of viability to the population or species. AR003143–44.

Alliance contends this admission that there is an impact on these species runs

contrary to the Forest Service's final FONSI. It claims the FONSI is "counter to the evidence" and is "so implausible" that it cannot be said to be simply a difference of opinion or agency expertise; it is simply flat-out wrong. Dkt. 36, at 26.

To begin, the Forest Service claims Alliance did not allege any claims relating to the fringed myotis in the Complaint. This is true. Alliance referenced "the fisher, flammulated owl, pygmy nuthatch and other species . . . " in its Complaint. Dkt. 1, at 14. At oral argument, Alliance recognized the inconsistency, but avowed the species correctly identified were sufficient to illustrate the Forest Service's failures. The Forest Service also claims, again, that Alliance's argument shifted between its opening brief and its reply brief, but that at its base, this is still a "hard look" argument regarding the analysis the Forest Service did with respect to any relevant species that would be affected by the Project.

The EA and the Wildlife Report thoroughly examine the impacts of the project on these three species. AR002671-73 (EA section analyzing impacts to the three species); AR003137-44 (Wildlife Report section analyzing impacts to the three species). Importantly, the Forest Service affirmatively recognized there *would* be some impact on these three species because of the Project.[13] So it cannot be said, as Alliance suggests, that the Forest Service overlooked any impact on these species.  In fact, as stated in the EA, the Project was created in part to *benefit* flammulated owl habitat, and by proxy, other species that use the same habitat, including the pygmy nuthatch and fringed myotis. *See* AR002618

---

[13] For example, as it relates to the flammulated owl, the Forest Service explained that "[w]hile there may be some risk to capable habitat (snag loss and reduction of roosting habitat) associated with timber harvest, several studies have documented flammulated owl use of selectively logged sites." AR003143. Thus, far from ignoring or burying any negative impacts the Project may have on these species, the Forest Service recognized and addressed the concerns.

(explaining one of the stated purposes of the Project is to "improve the dry site stand conditions for Flammulated owl habitat . . . ."). The Project follows through on this purpose, as demonstrated in the EA and the Wildlife Report.

The Forest Service ultimately determined the potential disturbance created by the Project would be "of minor consequence given the mobility of these species, the silvicultural prescription to retain large trees and snags, and the post-treatment benefit of maintaining dry-site forest conditions beneficial to this group." AR003142. This is a reasonable conclusion considering the evidence and analysis in the record. *See, e.g.,* AR003098–99; AR003137–45.

Alliance's disagreement with the data, the analysis, and the conclusion is not sufficient to call into question whether the Forest Service took a "hard look" at the environmental impact of the Project on wildlife. Because the Forest Service did look at the impacts and effects the Project would have—including potentially negative effects—on these three species, the Court cannot find it violated NEPA. That the Forest Service's evaluation and review concluded in a FONSI (while Alliance's summation of the data may have resulted otherwise) is not reason alone to overturn the decision. AR002535. Summary judgment for the Forest Service is appropriate on this claim.

### C. Claim Eight

Finally, in Claim Eight Alliance alleges the Forest Service violated NEPA when it failed to adequately consider the cumulative impact of the Salvage Project on fisheries, hydrology, wildlife, and vegetation.

At its base, the Salvage Project is a road maintenance project. The Forest Service

plans to remove dead, downed, and hazard trees withing 200 feet of various road segments, totaling approximately 412 miles of road. The Forest Service also plans to clear vegetation along road shoulders for approximately 612 miles of road (this includes the 412 miles of salvage). Notably, although the Salvage Project is not currently scheduled, the EA states it is "reasonably foreseeable." AR002635–36. After completing its review, the Forest Service found that the environmental impact of the Salvage Project would not be significant and issued a FONSI. AR002561.

Alliance argues the aforementioned conclusion was arbitrary and capricious because the Forest Service did not provide a detailed analysis of the situation. By Alliance's reading, the Forest Service failed to provide concrete numbers, specific analysis, and quantifiable figures addressing any potential impacts of the Salvage Project, relying instead on a more cumulative review. In short, Alliance contends the Forest Service was vague. Pointing to Ninth Circuit cases, Alliance demands "some quantified or detailed information," *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379–80 (9th Cir. 1998), about the potential environmental impacts, or, at the very least, some "time, type, place, and scale" details about how the Salvage Project will impact the surrounding environment. *Lands Council v. Powell*, 395 F.3d 1019, 1028 (9th Cir. 2005).

In response, the Forest Service alleges it has provided a great deal of detail about the Salvage Project. Listing all of the reports and documents where it reviewed any

potential impact on the environment,[14] the Forest Service concludes that it has done its due diligence and that the FONSI it issued should stand. Responding to the long list of sources provided by the Forest Service, Alliance avers those citations are still vague and cannot support a finding of no significant impact.

To a certain degree, this is a closer call than the claims analyzed above.[15] While the Forest Service outlined ample data regarding trees and animals *and* all of the impacts the Project may or may not have as it relates to burning, clear cutting, timber harvesting and related activities, its discussion about the Salvage Project is less robust. Better said, the discussion is less cohesive. Road maintenance is discussed extensively in the EA—*see, e.g.,* AR002621, AR002628, AR002631–32, AR002656–57—but the Salvage Project itself is only mentioned a few times. Thus, it is not entirely clear whether the road maintenance discussed in various parts of the EA is part of the Project or the Salvage Project. And those

---

[14] *See, e.g.,* AR002636, AR002677 (EA identifying the Salvage Project as a potential source of cumulative impacts and describing the Salvage Project's potential cumulative impacts to scenery); AR003117, AR003125, AR003133, AR003143 (Wildlife Report naming the Salvage Project as a source of cumulative impacts to wildlife, identifying each road along which the Salvage Project authorizes the removal of trees, and finding that each of the species addressed in detail in the Report—including the three species discussed above—will be only minimally, cumulatively impacted by the Salvage Project); AR003182 (Hydrology Report addressing cumulative impacts from the Salvage Project and finding that there would be no additional impacts in part because there are no Salvage units currently planned within Buckskin Saddle Project area watersheds); AR004135 (Vegetation Report identifying the Salvage Project as an action with potential cumulative impacts to vegetation); AR002648 (EA explaining that the Forest Service included all past activities on the forest vegetation resource when it analyzed cumulative effects to vegetation); AR003182 (explaining that all past harvest and road construction activities were incorporated into the baseline condition that was analyzed through modeling to determine impacts to hydrology).

[15] The parties did not brief this claim as extensively as the other claims at issue. And, while the Forest Service touched on Claim Eight briefly at oral argument, Alliance only mentioned it briefly in passing when the Court inquired about a new Ninth Circuit case. This is not to fault either party; each side can focus its efforts where it desires. The Court's point, however, is that this claim has not been as extensively briefed and argued as the other claims at issue today, which makes the analysis a little more difficult.

discussions do not always clearly outline any potential impacts the Salvage Project itself could have. It is this disconnect that seems to bother Alliance.

A note at the outset: if the Forest Service found the Salvage Project would not result in any significant impact, it would—to a certain degree—be difficult to produce quantifiable data to prove that point.[16]

Second, the Court agrees with Alliance that some of the Forest Service's citations to the record are less detailed than others.[17] Nevertheless, in cases published *after Neighbors of Cuddy Mountain* and *Lands Council*, the Ninth Circuit has held that specific data is not always required. *See, e.g., League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen,* 615 F.3d 1122, 1136 (9th Cir. 2010) (explaining that an "aggregate effects approach—which does not necessarily require specific time, place, and scale data—is not plainly erroneous or inconsistent with NEPA"). *Accord Ecology Ctr. v. Castaneda*, 574 F.3d 652, 666 (9th Cir. 2009) (confirming that "the Forest Service may aggregate its cumulative effects analysis pursuant to 40 C.F.R. § 1508.7 . . .").

Days before oral argument in this case, the Ninth Circuit issued a decision touching

---

[16] Said another way, it is difficult to prove something will not have any impact when it has not yet happened. The Forest Service can and did analyze the issue, but this is, of course, just an estimate. However, as the Forest Service outlines in the FONSI, it will undertake the Salvage Project consistent with all applicable standards, safety concerns, and with the "impacts on land and resources" in mind. AR002553.

[17] For example, many citations—such as AR002636 and AR004135—simply list the Salvage Project and state it may have a cumulative effect. But there are no details of exactly what that impact may be. A website is listed which appears to contain more information, but the link is no longer active so the Court cannot ascertain what, if anything, was outlined on the website itself (and an archived copy of the website was not provided to the Court). That said, other citations—such as AR002677 and AR003143—outline more specific impacts the Salvage Project will have on the forest. And to repeat, other areas in the EA outline what impacts road maintenance will have, but do not necessarily tie those activities to the Salvage Project (although that can be assumed). *See, e.g.,* AR002655–62 (discussing effects of road projects on hydrology, sediment delivery, water temperature, etc).

on the concept of cumulative review. While recognizing that "some quantified or detailed information is required" when looking at the cumulative effects of a project, the Circuit also noted the specific EA (or EIS as the case may be) and the other items in the record must be considered when determining whether the agency truly took a "hard look" at the environmental consequences and whether the public had sufficient information to understand the plan and any potential effects. *N. Cascades Conservation Council v. United States Forest Serv.*, 136 F.4th 816, 828–9 (9th Cir. 2025).

Could the Forest Service have been more detailed when discussing the possible impacts on the environment of the Salvage Project? Potentially. Afterall, more detail is often likely to help. And, as noted, some of the Forest Service's citations and analysis contain generalized language. That said, other citations contain a more full-bodied discussion of any potential impacts the Salvage Project could have on the environment.

Ultimately, when the Court looks at the whole record, it cannot find the Forest Service failed to take a "hard look" at the situation or that the Forest Service's analysis and decision—based on dozens of reports, studies, and summaries—was arbitrary or capricious. Additionally, when viewing the information in the aggregate, the Court finds the public was adequately apprised of the Salvage Project and its potential impacts to a sufficient degree where it could have objected or raised concerns. There is, therefore, a sufficient nexus between the Forest Service's review and its conclusion on this issue.

In short, summary judgment is appropriately granted in the Forest Service's favor on Claim Eight.

**D. Relief Sought**

As a final matter, Alliance argues the Court should vacate the Forest Service's FONSI and enter an injunction against implementation of the Project. The Forest Service counters that vacatur is an extreme remedy and that, in the event the Court finds error, it should allow additional briefing on the proper scope of any remedy. Because the Court has ruled in favor of the Forest Service today, there is no need to discuss the scope of Alliance's requested relief.

## V. CONCLUSION

APA cases are challenging. Here, the Court must determine whether the Forest Service complied with NEPA and performed a satisfactory review and analysis of numerous complicated questions within its area of expertise, or if its decision was arbitrary and capricious. But the Court cannot look for a particular result. It must simply review whether the process the Forest Service followed was adequate. *See Robertson*, 490 U.S. at 350 ("[I]t is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process.").

Thus, whether the Court would have done the review differently or reached different conclusions based upon the data is irrelevant. The question is whether the Forest Service "committed a clear error in judgment" in its decision and FONSI. *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1114-15 (9th Cir. 2000) (cleaned up), *abrogated on other grounds* by *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011). Upon this record, the Court cannot find that the Forest Service acted in an arbitrary or capricious manner or that it clearly erred in finding the Project (and the Salvage

Project) would not result in a significant environmental impact. Having reviewed the administrative records—including numerous reports, studies, and analyses—the Court finds a "reasonable basis exists for [the Forest Service's] decision." *Nw. Ecosystem All.*, 475 F.3d at 1140. Accordingly, summary judgment is appropriately entered in favor of the Forest Service on each of Alliance's claims.

## VI. ORDER

1. Alliance's Motion for Summary Judgment (Dkt. 37) is DENIED.

2. The Forest Service's Motion for Summary Judgment (Dkt. 40) is GRANTED.

3. The Court will enter a separate judgment in accordance with Federal Rule of Civil Procedure 58.

DATED: July 1, 2025

David C. Nye
Chief U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 27